Case No. 16-5098. Regents of the University of California on behalf of its participating plaintiff hospitals et al. appellant v. California Pacific Medical Center Davis Campus et al. v. Tom Price, Secretary, Department of Health and Human Services Mr. Seagroves for the appellants, Mr. Claire for Affili Price Case No. 16-5098. Regents of the University of California on behalf of its participating plaintiffs Good morning, Your Honors, and may it please the Court. James Seagroves on behalf of the appellant hospitals. The Supreme Court has made clear that while agencies have the discretion typically to change their rules, with that authority and ability comes a baseline requirement that at a minimum the agency must be forthright when it is changing its rules. That, of course, is primarily established by the Fox Television decision. The primary question presented in this case is whether the Secretary of Health and Human Services' 2005 rulemaking complied with Fox Television. Now, as an initial matter, the Secretary dedicates a significant portion of her brief excuse me, his brief, we have had a change in Secretary, to arguing that this issue is not properly before the Court because of comment waiver. As we explain in some detail in our reply brief, we think that that argument should be rejected for three reasons, the first of which being that circuit precedent established under Murphy Exploration is still very much good law, has not been rendered or abrogated. Assume it's properly before us, why is it unreasonable for the agency to have proceeded as it did here? It sees a problem in a program, inspector general report, tries to fix the problem, going forward. At the most basic level, Your Honor, the unreasonableness is that the Secretary determined or asserted in the rulemaking that the cause of that problem was the failure of hospitals to comply with a 2003 manual revision. That as we explain in our briefs, as a matter of law, could not have amended or altered the 1994 rule, notice and comment rule. Say there had been no 2003 manual, just hypothesize that for a second, what's wrong with them changing it in 2005? Yeah, as a hypothetical, there certainly is nothing wrong with them wanting to change the rules. The problem comes in, in this case, in that the Secretary historically has a practice of when she changes the accounting standards that are to be utilized for purposes of calculating the wage index, that is reflected in the 1994 rulemaking, the Secretary has a policy or had a policy of delaying implementation of such changes. And of course, in the 1994 rulemaking, there was no question that the Secretary was changing the rules. So I agree that that's a decent argument for you, that there's been done differently before, but if they see what's called, I'll call it a loophole, and you may disagree with that characterization, I understand that, but for present purposes, a loophole, and they want to close the loophole going forward, why do they need to give as much lag time as they did in 1994? Well, it's not a loophole in the following sense. Right, that's... Everything that the hospitals reporting their pension and other deferred compensation costs using GAAP was not only permissible under GAAP, the Secretary in implementing the GAAP rule in 1994 specifically envisioned the situation and said, look, there are benefits to using a Medicare accounting principles funding relevant accounting system, but there also are benefits to using GAAP, which as we explained in the briefing, the Secretary explained in 1994 has the benefit of there not being wild fluctuations year over year based upon the peculiarities of a particular hospital's funding decisions vis-à-vis its pension plan. And so for the Secretary to, and I certainly think it's fair to characterize the tone of the 2005 rulemaking as suggesting that there is a loophole that we're trying to close, is as a matter of administrative law, incorrect. Because again, the characterization of a loophole, which is perhaps understandable given, I think, if one looked at the OIG memorandum that was in the rulemaking record, not only did the Office of Inspector General inform the Secretary that her 2005, excuse me, 2003 manual revision was not consistent with the 1994 rule, which I think an easier way of saying that would be inconsistent with. The Office of Inspector General, when one looks at that, and it's of course reproduced in the Joint Appendix, the Office of Inspector General characterized the 2003 manual provision as a requirement, treated it as if it was a notice and comment rule. So whether the Secretary agreed with that characterization or acquiesced in it, and certainly I think it's fair to say that when the Inspector General, certainly within HHS, when the Inspector General of an agency tells the head of an agency, hey, you've got a problem, and it's causing, in the IG's terminology in this case, it is causing the over-reporting and potential skewing of the Medicare wage index. That's a big deal. And certainly can I be surprised that an agency head in that context might not want to admit that, well, But putting aside how they characterized things in the 2003 manual, what you need, what you're concerned about, I think, is that you did things in 2003 and 2004 that you would have done differently had you known the 2005 rule was coming. I think that's, in the end, the thrust of what you're concerned about. And what I'm trying to, on that argument, which is that it was unreasonable for the agency to change this without a further lag time, it seems to me you have to show at least what exactly you would have done differently in 2003 and 2004, and I don't see it. And certainly I cannot point to a statement in the record that demonstrates that, gosh, if we had really known that. Well, then what's the concern? Right, so here's the reasonable reliance interest. Yeah, what's the secondary retroactivity problem if there isn't such? Yeah, I think it is in the sense that the assertion here is not that hospitals have a reasonable reliance interest on keeping GAP in place. It's the reasonable reliance interest that if the secretary is going to turn the ship, at a minimum she's going to address the fact that she's turning the ship, and here are the ramifications. And here is why, despite those ramifications. Well, you know the ship's turned in 2005, though. I think that's certainly, in the comments, the University of California and the Federation certainly said that. They said this is a substantial turning of the ship. This is changing, this is turning the ship. But, you know, this is a cruise liner and not a schooner. This is a ship that, at least historically, the secretary when- But that's where I get to the point of, well, what would you have done differently? They're allowed to turn the ship, right? So the question then becomes, on the retroactivity argument, what would you have done differently in 2003 and 2004 to show that the way they turned the ship and didn't give the lag time was so unreasonable as to violate the Administrative Procedure Act? I think at a minimum, if the secretary had been forthright, and that's terminology from Fox Television, the FCC there was forthrightly acknowledged, I believe it was Justice Scalia's terminology. And what's the remedy for that, suppose? Yeah. Okay, so they go back and we say, okay, we'll be forthright. Yes, we've changed, not just clarified. I think the remedy for that is the traditional remedy for an arbitrary and capricious violation, which is, depending upon the panel of this court, is vacate and remand or remand without vacater. I think that what the secretary- Let's assume for the sake of- But then they couldn't just reinstitute the same thing, or what would happen then? Yeah. Let me assume for the sake of discussion that the secretary would have the statutory authority to do that, because I think that would perhaps be a significant bone of contention, because now we would be, in 2017, 2018, talking about changing a rule applicable to fiscal years 2007 and 2008. And certainly 1395HH imposes some limitations on the secretary. We would perhaps be going back into a primary retroactivity argument. But let's assume for the sake of discussion that the secretary would have statutory authority to do that. I think that it's not clear to me that the secretary, if the secretary had really understood the state of play, in the sense that if the secretary had understood that this manual revision really, as a matter of law, didn't change the 1994 rule, certainly I think it's possible that the secretary might look at this and say, you know what, the hospitals have a point here. We're going to address. I mean, certainly the remedy in this kind of situation upon remand can get somewhat messy. But I think that it's possible that I could see perhaps another notice and comment process. Certainly that's what the University of California and the Federation said the secretary should do. How much money is involved here? According to the exhibits to the board's decision, which I think in the record is the clearest quantification, we're talking about $75 million for the plaintiff appellants in this case. There have been hospitals who chose not to appeal from the district court's decision, so that would go down. We also, of course, are talking about statutory interest. But we would be also, I think, in a situation where the secretary would have various options available to her, and certainly the hospitals would be able to perhaps look from a rational business standpoint and think, do we really want to drag this out for another six years? I mean, we are talking about litigation that's been pending for quite some time. If there are no further questions at this point, I'll preserve the remainder of my time for rebuttal. Thank you. Thank you. Good morning, Your Honors. May it please the Court, I'm Jeffrey Clair, counsel for the secretary in this matter. Your Honors, $75 million sounds like a lot of money. It sounds like the sort of money where if you have a problem with the agency's rulemaking, if you have a problem with the manner in which the rulemaking is conducted, a procedural objection or some concern that the agency hasn't sufficiently articulated what it's doing, that's the kind of concern that has to be presented to the agency in the rulemaking, not to have the parties wait to an administrative proceeding where the administrator at an administrative tribunal has no authority to question the validity of the regulation. I thought you could always challenge a rule in an adjudication. Well, Your Honor, I think that the underlying principle of the waiver doctrine is that the objections have to be at a time appropriate to its administrative process, and when you have an adjudication or an enforcement proceeding where the a priori rules are that the validity of a regulation cannot be considered or contested in that proceeding, that suggests to me that the appropriate time under the agency's practice has to be when the rulemaking is underway. Now, Your Honors, I read Judge Suntell's opinion for the Court and Murphy carefully, especially carefully when I found out Judge Suntell would be on the panel this morning, and I think let me offer, if I can, a couple of reasons why I think that decision should not be controlling here. The regulation you had at issue at Murphy too? Well, including the modification of the opinion after the petition for a hearing, yes, Your Honor. With the rule at issue in Murphy, there was a statute that said if a sort of royalty, a mineral extraction royalty dispute had been pending before the Department of Interior for a certain amount of time without a final decision, then the aggrieved party could go right into a court without awaiting a final decision. The agency adopted a rule that purported to say what types of administrative proceedings could go forward in court. So it was a rule that was addressed to the Court's jurisdiction. As the Murphy opinion notes, that is not a situation where sort of Chevron deference principles come into play. It's not a situation where the agency's interpretation of its organic statute is at issue or where sort of considerations of having the agency's view on a question are really important to the adjudication of the case. This is a very different kind of case. This is a rule that is a challenge that is directed to the sufficiency of the administrative process. It is, moreover, a rule that, as the sort of amount of money at stake makes clear, it is a rule that is almost always a vital concern to a hospital. Medicare reimbursement is the lifeblood for virtually every major hospital institution. These prospective payment rules come out every year in August. They are well known to the regulated community. They are watched carefully. There is every notice and opportunity for regulated parties to object. Difficulty with us issuing an opinion is that our opinions tend to be precedent for more than the case in front of us. Of course. And it's not always the case that a person, an entity, which is regulated by a rule, knows that it has standing to challenge a change in a rule until it is applied to that entity. Sure. That's what I'm saying. And then you have to have the rule. A comment waiver means you didn't find the fee at any point. I think all that is certainly correct and consistent with the Court's precedent, but this is a case where the issues are already ripe at the time of the rulemaking. It's not a case where you need to know how the rule is applied before you understand what its parameters are and how it's going to affect you. These litigants, in fact, participated in this rulemaking. All of them? Well, the university, the lead plaintiff at least, the University of California. There are 100 and some hospitals here. How many of those hospitals participated? That I don't know, Your Honor, or 100. But the lead plaintiff, the one making the principal arguments to the Court here, is making the arguments. And I think, as Judge Williams' concurrence in Coretta suggests, there may be occasions where smaller parties can't rely on a larger party to present these comments to the agency. But in this case, the larger party, the mover, the principal mover on the wage index  This would be a pretty significant shift in our jurisprudence, at least from my perspective. So maybe I could ask you about the merits. I'd be happy to move on at this juncture. Your Honor, what's been missing in my opposing counsel's presentation is any consideration of the statute. The statute that governs the wage index says that the labor-related share of the reimbursement formula has to be adjusted for wage-related costs, not wage-related liabilities. At no point in the history of the administration of this statute has the agency had a policy that said you can get credit in the wage index for liabilities, whether you've paid them or not. Now, the adoption of the GATT rule didn't have a specific requirement that liabilities be liquidated in a timely fashion. I think Your Honor is correct in at least characterizing the agency's conception of that is something of a loophole. It never intended to create a regulatory scheme in which providers could claim credit in the wage index for expenses that they simply had not paid and were not likely to pay in the future. In terms of when the agency set out to fix this problem in the 2005 rulemaking, it traced this issue in the development of the agency's policy all the way back to the 1994 rule. It explained why it had adopted GATT in the first instance. It explained what problems had emerged in applying GATT, this problem of providers simply not liquidating their liabilities in a timely fashion. It noted that in 1995 the agency had made clear in a regulation governing hospitals paid on a cross basis that these liabilities had to be liquidated in a timely fashion. It promulgated a manual provision in 2003 that specifically stated that would be the same rule for hospitals reimbursed under the prospective payment system. And then in the rulemaking at issue here, it enshrined that requirement in a regulation that would be binding on regulated parties. And the injunctive. Can you in a nutshell give me the difference between, let's say GATT, is there a particular FASB that governs the accounting, financial accounting for these pension liabilities? I believe that GATT and FASB have somewhat different rules for accounting for pension liabilities. The problem that I think the Secretary didn't realize about GATT was that GATT is simply about how liabilities were recognized. It wasn't a set of procedures that dealt with whether liabilities were properly discharged. So GATT has in it no timely liquidation requirement. But the Secretary is not designed to do what has to be done under Medicare. Right, Your Honor. And I think that was what the Secretary came to that realization after GATT was adopted. It was never the intent that that be the rule for Medicare. When the Secretary realized that there had been effectively this inadvertent loophole by adopting GATT, it set out on a course to fix it. And when it adopted the rule that's at issue here, it traced the entire development of the rule. This is not a situation where the agency demonstrated no awareness of what the prior policy had been or failed to explain why that prior policy was not sufficient for Medicare purposes. Well, the discussion about, you know, the agency representative was clarifying that prior policy rather than adopting a new policy, respectfully, I think is somewhat beside the point here. Whether it is a clarification or not, the agency went back to the prior policy. There's no requirement under FOX or any other case that the agency has to say we're changing. I agree, Your Honor. The agency has to offer reasoned basis for its decision. It has to look at the relevant factors. If there has been a prior policy, well, that, you know, the reason for the change may be a relevant factor. But that was plainly considered here by the agency. And in the agency's view, this had been the policy all along. Was it enshrined in a binding rule? Well, that's why they went through the 2005 regulation. But the notion that the agency didn't grapple with the prior policy, explain its deficiency, explain the basis for imposing a new rule simply isn't borne out by the rule. The only weak part of what you just said or the weak is that it had been the same policy all along. I mean, I just think that's a little bit of a reach here. Well, Your Honor, I think it was certainly the intention of the agency to have that policy. Okay, that may be true. And that's clearly demonstrated in the 2003 manual provision where the agency said this is going to be where you're going to have to timely liquidate your liabilities for credit in the wage index in the prospective payment system. I understand why people like to say clarify when they're really saying something different. Usually that's a tip off. Perhaps, Your Honor, but in any event, whether this was a clarification or a new rule, the agency satisfied the State Farm, FOXB, FCC requirements of the rulemaking, that it reasonably explained its position. Your Honors, unless there are further questions, I'll go rest on the bench. Thank you. Thank you. We'll give you two minutes for rebuttal. Actually, I think I owe you more than two minutes, so we'll go until... It's a long day. I understand. When Congress enacted the APA in 1946, they didn't say that arbitrary and capricious means something if it's a $75 million case or a $1 case. They said it's the same standard. Congress, moreover, has established the judicial review provisions in the Medicare Act, understanding that there could be situations in which the Secretary makes a mistake that means that money has to be paid out. And I think that if we are going to alter the arbitrary and capricious standard, depending upon the amount of money at issue, I think what we do is we deprive one of the incentives for the Secretary to play it straight. This is an important rulemaking process each year. I don't think the money point helped you in the sense of if there's a lot of money involved, all the more reason to be concerned about the government playing fast and loose with things. That's your characterization. I also believe that we have a lot of federal taxpayers in this room, and we all understand where money comes from. I could say that there have been, in the grand scheme of things, $75 million in a Medicare case. Change. Well, true, but we look at L.A. County, which was a decision involving outliers. I mean, we're talking about hundreds of millions of dollars, I think, in that case. I think the most essential point that was made by my friend on the other side was that the Secretary never imagined, envisioned, intended for hospitals not to liquidate their liabilities. That assertion cannot be reconciled, we respectfully submit, with the page in the final rule from 1994 in which the Secretary looked specifically at this issue and said, here's why we're going with GAAP, and not a funding-based methodology, because up until that point, the Secretary had followed a funding-based methodology. From 1983, approximately, to 1994, that was the rule. And the Secretary said, we're going to change it to GAAP. We like the benefits of that. We recognize that there are arguments on both sides of this issue. Here's why we're going with GAAP. Lastly, Judge Randolph, I thought I understood you to say that Fox Television doesn't require an agency to acknowledge or state when it's changing its rules. No, that's not what I said. I apologize, then, I obviously misunderstood. What I mean is they don't have to use the word change. I think I would agree that certainly the Supreme Court's decision doesn't say that. The Supreme Court's decisions say they have to acknowledge that they are changing. And certainly we're not asserting that the mere use of the word clarification is an ah-ha, there's a violation here. It's one sign. And I think what's more important is that. What if the agency just says, look, our new rule is different than the old one, and here's why we're adopting the new rule. So here's, in addition to doing that, what the agency would have done, had to have done in this case, was to at least address why the Secretary was choosing to turn the ship faster than turning the ship in 1994. At least address that. Don't act like you have a bunch of scofflaw hospitals who are out here violating the law. And I think it's also telling that not even the Inspector General in this case asserted that hospitals for these prior periods owed money back for following. No, the hospitals were taking advantage of the law as written, which is appropriate, one might say. I would certainly say. And then the government says, well, no, we don't want to allow payments, that degree of payments, so we're going to change something or clarify something, and we're not going to allow it anymore. It doesn't mean there's your scofflaw. It just means that you were doing what you were allowed to do, but you're no longer allowed to do. So at least the agency should be forthright that it's changing its rules. And if I may finish with this statement. When one looks at what the Secretary did in the preamble to the 2005 final rule, we see the case made by an advocate who is responding to two comments who said this is a substantial change. And the Secretary, it's not just the use of the word clarification, which is repeated something like five or six times on a single page of the Federal Register. It's the case that's made starting out 1994, then a 1995 regulation that even the Board said, whoa, whoa, wait a minute, that doesn't apply here. And then there's the 2003 manual revision. So the Secretary was advocating a case as to why this wasn't a change, and we think that that falls under that. Well, it's before FOX. You know, I think it's interesting. I think agencies were scared of acknowledging change before FOX because they thought they had to meet some higher burden. Yeah, I mean, I think it's fair, if I may, I think it's fair to say that FOX is just an extension of State Farm at a minimum. It is, but there was confusion about exactly, or disagreement even about what. The clarification of State Farm. Yeah, exactly. With that, thank you. That's a good way to close. Thank you. Case is submitted.
judges: Kavanaugh, Sentelle, Randolph